JASON R. MAIER, ESQ.
Nevada Bar No. 8557
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone:  702.629.7900
Facsimile:  702.629.7925
E-mail:      jrm@mgalaw.com
              djb@mgalaw.com

*Attorneys for Plaintiff Tatum Gitlitz*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TATUM GITLITZ, individually, <br><br> Plaintiff <br><br> vs. <br><br> BITRATE PRODUCTIONS, a domestic corporation; DOES I through X; and ROE CORPORATIONS I through X, inclusive, <br><br> Defendants | Case No.: 2:24-cv-01081-JAD-DJA <br><br> **Order Granting Motion for Default Judgment and Closing Case** <br><br> ECF No.  23 |

## I.    INTRODUCTION

Before the Court is Plaintiff Tatum Gitlitz's motion for entry of default judgment.  For the following reasons, the Court grants the motion for default judgment.

## II.    BACKGROUND

Plaintiff Gitlitz sued Defendant Bitrate Productions in June 2024, alleging claims for Title VII sex discrimination and violation of the Pregnancy Discrimination Act of 1978; sex discrimination in violation of NRS 613.330; and violation of Nevada's Pregnant Worker's Fairness Act, NRS 613.4353-4383; ECF No. 1.

Gitlitz's Complaint alleges that she worked as a Model Dealer for Defendant, and after she became pregnant, Bitrate's management team accused her of becoming "huge," and tried demoting

1

her to a new position, entitled "Shuffler," where she would shuffle cards off-camera for $10/hour less than she was earning as a Model Dealer. The Complaint alleges that Bitrate chose to create this brand new "Shuffler" position instead of simply allowing Gitlitz to transition to the role of an off-camera Model Dealer (which already existed, as there were other off-camera Model Dealers who shuffled off-camera for the same pay as the on-camera Model Dealers). ECF No. 1.

In essence, Bitrate offered to "accommodate" Gitlitz's pregnancy by forcing her into a demoted position with a pay cut, where she would be doing the same job duties (shuffling off-camera) as the off-camera Model Dealers, but under a different title. On November 8, 2023, Bitrate discharged Gitlitz after she refused to transition to this demoted position. ECF No. 1. The well-pleaded facts of Gitlitz's Complaint will be deemed as admitted by Bitrate in light of the default entered on November 20, 2025. ECF No. 22.

On October 31, 2024, because Gitlitz's employment agreement contained a valid arbitration clause, this Court issued an order granting Defendant Bitrate Productions' motion to compel arbitration and stayed the case pending resolution of the arbitration. ECF No. 16.

After that point, the matter proceeded to arbitration through Advanced Resolution Management, with the parties selecting Hon. Jay Young (Ret.) as the Arbitrator.

Thereafter, on August 6, 2025, Gitlitz filed a motion to lift the stay, arguing that Bitrate had failed to participate in arbitration or pay the required fees, which led to the arbitrator canceling the proceedings entirely. ECF No. 18.

Also in August 2025, Bitrate's counsel of record filed a motion to withdraw. ECF No. 19.

On September 26, 2025, the Court granted Gitlitz's motion to stay, finding that Bitrate had defaulted in the arbitration proceedings and that there was no evidence of Bitrate intending to comply with its financial obligations for the arbitration to move forward. ECF No. 20.

Also in its September 26, 2025, order, the Court granted Bitrate's counsel's motion to withdraw, and ordered Bitrate to retain new counsel, and for that counsel to file a notice of appearance by October 27, 2025. *Id.* The Court held that if Bitrate failed to comply with the order, Gitlitz could seek entry of default against it. *Id.*

Gitlitz ultimately did seek entry of default against Bitrate after it failed to comply with ECF

No. 20, and default was entered on November 20, 2025.  ECF Nos. 21–22.  On March 11, 2026, Gitlitz filed this motion for default judgment.  ECF No. 23.

## III.    DISCUSSION

Federal Rule of Civil Procedure 55(b)(2) permits a plaintiff to obtain default judgment from the court if the clerk previously entered default based on defendant's failure to defend.[1]  The court has discretion to enter a default judgment,[2] which is guided by the seven *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.[3]

As default has already been entered in this case, I must take all the complaint's factual allegations as true, except those relating to damages.[4]  "[N]ecessary facts not contained in the pleadings, and claims [that] are legally insufficient, are not established by default,"[5] and the court can consider additional proof of facts or damages to ensure that default judgment is appropriate.[6]

In considering the seven *Eitel* factors, the Court finds that default judgment against Defendant Bitrate Productions is warranted.  The first and sixth factors favor granting default judgment because Bitrate failed to abide by the Court's order requiring it to obtain new counsel by October 27, 2025, and to-date, no new counsel for Bitrate has entered an appearance, which is indicative that there is no excusable neglect.  Bitrate's failure to appear for such a sustained period of time (over five months after the deadline provided by the Court) prejudices Gitlitz by preventing her from recovering the value of her loss of income and her emotional-distress damages.  While the seventh factor generally counsels against the granting of default judgment, Bitrate's failure to appear

---

[1] *See* Fed R. Civ. P. 55(b)(2).

[2] *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

[3] *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

[4] *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).

[5] *Cripps v. Life Ins. Co.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

[6] *See* Fed. R. Civ. P. 55(b)(2).

prevents the Court from determining the claims on their merits.

The Court next examines the merits of the substantive claims and sufficiency of the Complaint. Gitlitz seeks default judgment for (1) Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) – Sex Discrimination and Violation of the Pregnancy Discrimination Act of 1978; (2) Violation of NRS 613.330 – Sex Discrimination; and (3) Violation of Nevada's Pregnant Worker's Fairness Act, NRS 613.4353-4383. ECF No. 1. The Court finds that the second and third *Eitel* factors, the merits of the substantive claims and the sufficiency of the complaint, respectively, favor judgment for Gitlitz.

### A. Sex (Pregnancy) Discrimination Under Title VII and NRS 613.330

Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, makes it unlawful to discriminate against any individual with respect to the employee's compensation, terms, conditions, or privileges of employment, because of the employee's or sex or pregnancy status.[7]

A plaintiff can prevail on a claim for intentional gender discrimination by showing that: (1) she belonged to a protected class; (2) she was qualified for her job; (3) she was subjected to an adverse employment action; and (4) similarly situated employees not in her protected class received more favorable treatment.[8] These same elements apply to analysis of a job discrimination under NRS 613.330, as federal case law is used to interpret Nevada's statutes.[9]

Gitlitz alleges she was discriminated against based on her status as pregnant woman, culminating in her wrongful and illegal termination. Gitlitz was a qualified and successful Model Dealer and a valuable employee of Bitrate. After she became pregnant, Bitrate accused her of being "huge" and tried to force a "Shuffler" position on her, which came with less pay and would require her to do the same thing she was already doing (shuffling), just off-camera. Gitlitz alleges that similarly situated employees (dealers who were not pregnant) received more favorable treatment

---

[7] 42 U.S.C. § 2000e-2(a)(1); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986). *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015) ("Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy.").

[8] *See Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002).

[9] *See Pope v. Motel 6*, 114 P.3d 277, 279 (Nev. 2005).

because there already were some Model Dealers who were shuffling off-camera but for the standard pay – not at a demoted rate.  Bitrate terminated Gitlitz when she would not agree to the adverse treatment based on her pregnancy status.

The Court finds, accepting these supported allegations as true, that there are sufficient facts to support a finding in favor of Gitlitz against Bitrate on the claims for 1) Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) – Sex Discrimination and Violation of the Pregnancy Discrimination Act of 1978; and (2) Violation of NRS 613.330 – Sex Discrimination.

**B.      Violation of Nevada's Pregnant Worker's Fairness Act**

The Pregnant Workers Fairness Act (under NRS 613.438) prohibits employers from requiring a female employee who is pregnant to "accept an accommodation that the employee or applicant did not request or chooses not to accept."[10]  Gitlitz alleges that she did not request an "accommodation" in the form of a demoted position.  There also is no "bona fide occupational qualification" at issue, as dealing and shuffling cards does not come with a legitimate size requirement.

Specifically, Gitlitz alleges that after she became pregnant, Bitrate's management team accused her of becoming "huge," and tried demoting her to a new position, entitled "Shuffler," where she would shuffle cards off-camera for $10/hour less than she was earning as a Model Dealer. Bitrate chose to create this brand new "Shuffler" position instead of simply allowing Gitlitz to transition to the role of an off-camera Model Dealer (which already existed, as there were other off-camera Model Dealers who shuffled off-camera for the same pay as the on-camera Model Dealers).

In other words, Bitrate offered to "accommodate" Gitlitz's pregnancy by forcing her into a demoted position with slashed pay, where she would be doing the same thing (shuffling off-camera) as the off-camera Model Dealers, but under a different title.  On November 8, 2023, Bitrate discharged Gitlitz after she refused to transition to this demoted position.

The Court finds, accepting these supported allegations as true, that there are sufficient facts to support a finding in favor of Plaintiff Gitlitz against Defendant Bitrate on the claim for Violation of Nevada's Pregnant Worker's Fairness Act, NRS 613.4353-4383.

---

[10] Nev. Rev. Stat. § 613.438(d).

**C.    Damages**

In reviewing a default judgment, the Court accepts all well-pleaded factual allegations in the complaint as true.[11]  The Court does not accept factual allegations relating to the amount of damages as true, and while default establishes a party's liability, it does not establish the amount of damages claimed in the pleading.[12]

***1.    Back Pay***

A prevailing plaintiff in a discrimination suit arising under Title VII is generally entitled to an award of back pay.[13]  Under Title VII, back pay begins accruing on the date of termination (or up to two years prior to the date on which a formal charge of discrimination is filed) and continues up to the date the discrimination is rectified.[14]  In the meantime, Title VII requires claimants to use reasonable diligence in finding other suitable employment.[15]  The burden of proving a failure to mitigate damages in a Title VII case lies with the defendant.[16]

The Court has reviewed Gitlitz's submission of evidence in support of her back pay request, specifically her 2023 W-2, and Gitlitz's affidavit which confirms that Gitlitz was unemployed and diligently searching for new work for ten months following her termination.[17]  Accordingly, the Court finds that Gitlitz's back-pay damages total $44,222.17, which amounts to ten months of back pay.

---

[11] *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007).

[12] *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

[13] *See* 42 U.S.C. § 2000e-5(g)(1); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975) ("backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 843 (2001).

[14] 42 U.S.C. § 2000e-5(g)(1); *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986).

[15] 42 U.S.C. § 2000e-5(g)(1).

[16] *See Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978).

[17] ECF Nos. 23-1, 23-2.

### 2.      *Emotional-Distress Damages*

Statutory caps on compensatory damages for Title VII intentional discrimination claims are codified at 41 U.S.C. § 1981a.  The Court has reviewed Gitlitz's evidence that Bitrate had between 15–100 employees and is therefore subject to the lowest cap of $50,000 in compensatory damages. The Court has reviewed Gitlitz's evidence set forth in her affidavit, in which Gitlitz testifies to enduring significant emotional distress because of the wrongful termination, including: "immense stress, trouble sleeping, panic attacks, feelings of hopelessness and despair," and losing her apartment and being unable to contribute financially to her mother's funeral.  Accordingly, the Court finds that the statutory cap of $50,000 for compensatory damages is warranted.

### 3.      *Attorneys' Fees and Costs*

Under 29 U.S.C. § 216, "[t]he court . . . shall . . . allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."[18]  The Court uses the lodestar calculation to determine the reasonableness of the fees requested,[19] which is calculated by multiplying the number of hours the prevailing plaintiff's attorney reasonably worked by a reasonable market-sensitive hourly rate.[20]

The Court has reviewed Gitlitz's submission of evidence in the form of a complete copy of her attorneys' fee invoices, which detail each firm timekeeper's hours and tasks completed on this matter (redacted for portions that constitute attorney/client privilege).  ECF No. 23-6.  The Court has also reviewed Gitlitz's counsel's affidavit which verifies the reasonableness of the rates for each firm timekeeper.

Further, the Local Rules require movants to provide: 1) a reasonable itemization and description of the work performed; 2) an itemization of nontaxable costs; and 3) a brief summary of:

- The results obtained and the amount involved;
- The time and labor required;
- The novelty and difficulty of the questions involved;

---

[18] *See also* 29 U.S.C. §§ 626, 2617(a)(1)(A); 2617(a)(3).

[19] *Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir. 1987).

[20] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).

7

- The skill requisite to perform the legal service properly;

- The preclusion of other employment by the attorney due to acceptance of the case;

- The customary fee;

- Whether the fee is fixed or contingent;

- The time limitations imposed by the  client or the circumstances;

- The experience, reputation, and ability of the attorney(s);

- The undesirability of the case, if any;

- The nature and length of the professional relationship with the client;

- Awards in similar cases; and

- Any other information the court may request.[21]

An attorney affidavit confirming that the bill was reviewed and edited and that the fees and costs charged are reasonable is also required.[22]  Finally, Nevada law requires courts to consider the factors articulated by the Nevada Supreme Court in *Brunzell v. Golden Gate National Bank* when determining the amount of attorney's fees to be awarded.  Those factors include:

> (1) the qualities of the advocate: his ability, his training, education, experience, professional standing and skill; (2) the character of the work to be done: its difficulty, its intricacy, its importance, time and skill required, the responsibility imposed and the prominence and character of the parties where they affect the importance of the litigation; (3) the work actually performed by the lawyer: the skill, time and attention given to the work; (4) the result: whether the attorney was successful and what benefits were derived.[23]

Having reviewed the attorney affidavit and billing statements, the Court finds that these factors and considerations collectively weigh in favor of the requested fee award.  It appears that counsel diligently and competently succeeded in removing this case from the arbitration process and obtaining a default in favor of Gitlitz, with the judgment being in excess of $90,000 for Gitlitz. This involved a substantial amount of work over the course of many months.  While the claims in

---

[21] L.R. 54-14(b).

[22] L.R. 54-14(c).

[23] *Brunzell v. Golden Gate Nat. Bank*, 455 P.2d 31, 33 (Nev. 1969).

this case were not difficult or complex, the procedural challenges in this case were many and required some level of skill.

Gitlitz was charged a fee that changed as the fee increased over time, with rates depending on which individual at the firm was working on an entered task.  And those rates charged for counsel and paralegals were commensurate with other rates throughout the Las Vegas Valley for similar work and qualifications, making the fees charged reasonable.  The work performed was also reasonable.  Plaintiff's counsel's firm is a small one with limited resources.  During the discovery phase, Gitlitz participated in written discovery and counsel deposed a crucial fact witness and was set to depose another witness (Dean Elliott).  Gitlitz was forced to incur a substantial amount of fees and costs after Dean Elliott refused to appear for his deposition.  Plaintiff's counsel succeeded in getting the matter out of arbitration and remanded back to this Court, and in preparing a motion for entry of default judgment against Bitrate.  All of these phases were necessary and reasonably performed.  Gitlitz has demonstrated that an award of fees in the amount of $67,898.50 and costs in the amount of $4,256.84 is warranted.

### 4.    *Interest*

Nevada law provides that "When no rate of interest is provided by contract or otherwise by law, or specified in the judgment, the judgment draws interest from the time of service of the summons and complaint until satisfied . . . at a rate equal to the prime rate at the largest bank in Nevada as ascertained by the commissioner of financial institutions on January 1 or July 1, as the case may be, immediately preceding the date of judgment, plus 2 percent.  The rate must be adjusted accordingly on each January 1 and July 1 thereafter until the judgment is satisfied."[24]  The Court finds that prejudgment interest in this case began accruing on the day that Bitrate was served with the summons: June 14, 2024.  ECF No. 5.

---

[24] Nev. Rev. Stat. § 17.130(2).

**CONCLUSION**

IT IS ORDERED that Gitlitz's motion for entry of default judgment **(ECF No. 23) is GRANTED.** The Clerk of Court is directed to **ENTER JUDGMENT** in favor of the plaintiff and against Defendant Bitrate Productions as follows:

      1.     For backpay damages of $44,222.17;

      2.     Plus compensatory, emotional-distress damages of $50,000.00;

      3.     Plus reasonable attorneys' fees and costs of $72,155.34;

      4.     Plus prejudgment interest from the time of service of the summons and complaint, June 14, 2024;

      5.     Plus post-judgement interest at the statutory rate until satisfied.

The Clerk of Court is directed to **ENTER JUDGMENT accordingly and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
May 7, 2026